Thank you, Your Honor. Bo Sterling on behalf of Plaintiff's Appellants Kathleen Cox and John Keenan, also appearing with me, Kathy England, Trial Counsel, and Jocelyn Cortez, who gets a lot of credit for the briefing. This is an appeal from a final order of summary judgment. Do you want to reserve any time for rebuttal? I'm going to try to reserve a couple of minutes at the end, Your Honor. And I'll start thinking about that when I hit the five-minute mark. As I mentioned, this is an appeal from a final order of summary judgment in favor of the employer in an employment discrimination action under the ADA and under Nevada state law. The crux of our argument today is going to be that the summary judgment was improper because the Plaintiff's Appellants presented substantial evidence that the reason given by the employer for the termination was a pretext. The employee in this case, John Keenan, I'll refer to him as John if that's all right. John has the mental capacity of a seven-year-old. He cannot read. He has difficult handling complex social interactions with adults. At the time of his termination by Toys R Us in 2001, John was 51 years old. And in spite of his disability, he had been working at Toys R Us for over eight and a half years. I don't want to tell you how to spend your time, but we pretty much know what all of those facts are. So I think if you jump to the issues that you think create a triable issue, that would probably be most helpful for us, since you have limited time. Very good, Your Honor. Well, let's go ahead and start with the district court's order and the reasons given by the district court for why there wasn't any pretext in this case. First of all, yes. Counsel, maybe before we get to that. Sure. You agree with me that in this case, the employer had to know of Mr. Keenan's disability, correct? The employer had to know, certainly, yes. Before he could, I mean, you're saying that he was fired because of the disability. The employer had to know about the disability. Absolutely, Your Honor. What can you point to in the record that shows that? There's multiple things in the record. First of all, we have the testimony from the former director at Toys R Us, Bruce Weber, who said that he was aware that John was a little slow. I guess that's where my problem is. What exactly does that mean? He had a developmental disability, correct? Yes, Your Honor. In this particular case, don't you have to link up his disability with the propensity to get into fights or incidents with adults? Isn't that part of the connection here? Well, no. We're not saying that he has propensity to get into fights with adults. What we're saying is that he functions at a seven-year-old level, and we have the psychological report that substantiates that. I think Judge Martinez might be getting more specific in terms of, did Mr. Brooks have to know of the specific disability, or does he just have to know that he's slow? Does he have to know that his disability affects his customer service relations? He has to know that even if he's not told specifically that Mr. Keenan has a disability and doesn't specifically request an accommodation, he has to at least know that sufficient facts to establish the disability. In this case, that he's not able to, one, to read, two, that he doesn't fully understand what grown-ups are saying unless you explain it to him, sort of one item at a time. This is all stuff that's in the record, and that this affects Mr. Keenan's ability to perform certain functions around the Toys R Us store, which is why in the past he'd always been accommodated by the previous directors of the store by limiting his contact with customers to a certain extent. He wasn't put into the front of the store to perform cashiering functions and that sort of thing. He worked in the stock room and unloading the trucks and that sort of thing. Okay, well not doing, there was that you can't do a cashier, that means probably you can't do math, all right? That, you know, you can't be trusted with money, and I think that was known. What are they put on knowledge that he may have problems, what in the record do  they put on knowledge that he may have problems? Well, let's go back and look at the specific evidence, that's what the court's asking for, on the issue of awareness in particular. And what we have is, going all the way back to the beginning, we have the initial time that John was hired by Toys R Us, when his sister Kathleen comes to the store and tells the people in the hiring process that he went to a special school, that he can't read. The fact that she is there explaining the process on behalf of Kenan, of John, is certainly evidence, and she asks that that be put into the record and Toys R Us says no. So then we look over the history, the eight and a half years of what happened, and we have testimony from Bruce Weber, who was a former director, that he understood that John needed a little bit of additional supervision, for example, that's on page 120 of the excerpts of record, that John was a little slow. John said that he informed other supervisors, including Jeff Brooks, that he couldn't read. And there's also the testimony of other employees, several other employees, who specifically said that he was either slow or didn't perform at an adult level, that he had to explain things to him. Alright, he had customer service incidents previously, what do you have in the record about that? Well initially what we have, and this comes from Bruce Weber mostly, is we have some issues regarding performance issues, not necessarily misconduct issues, but issues regarding John completing tasks, following directions, and that sort of thing. And what the testimony there is, is that as requested by Kathleen Cox, his sister, that she was involved as part of that process. So she would talk to John, explain things to him, that she talked to Bruce Weber, explained to him that he couldn't read and that you couldn't give him written instructions. And when that was all done, those issues were worked out for the most part in the file. Now later on, if you look more recently, you see some conduct issues in the file, but they tend to be spread out somewhat, and they all seem to be, have been handled in a manner that was acceptable to Toys R Us ultimately. Is there anything in the record that says when he had issues with customers, then they put him in the back? Oh, certainly. Alright, well, I don't want to do your job for you, but isn't that kind of important? Yes, absolutely. And that's Bruce Weber's testimony. That's what he said. He said that John needs some additional supervision. When there was problems, that we would take him off the floor and we'd put him in the storeroom and loading and unloading trucks. Well, now the psychologist says something about that he was neat and he looked together. The judge seemed to rely somewhat on that. What's your response to that? Well, the testimony was that, in fact, that John was well-mannered. And, you know, one of the things that happened, I don't know if this is what you're getting at here, but it bears emphasizing. You know, after John was terminated and Kathleen Cox called on the telephone and talked to Jeff Brooks, you know, Jeff Brooks started talking about John having been engaged in fits of rage. And there's absolutely no evidence to document that or to support that. In fact, the evidence, I mean, we can look at the, I mean, we can actually look at the statements that the customer made. Would you like to go into that or is that not answering your question? Well, it's, you know, it's your job to show where there's a tribal issue. You know, giving all inferences in favor of your client. So anything that would be helpful to the court on that? Oh, sure. I mean, I know this Court's conducting a de novo review, but the District Court even acknowledged that, although there was some dispute as to the degree that managerial and non-managerial. Well, all right. I guess if you want to say about the instances of rage, if that's in the record, what I would argue in that situation is that would go to pretext, if he's raising that now, that if the claim is that he, that John was fired over, well, there seems to be an issue about whether he was fired or he quit. But that being said, I'll talk to other counsel for the appellee about that. But there seems to be two sides to that story, which is some indication there might be a tribal issue about whether he was fired or he quit. Now, as far as fits of rage, doesn't that fit into the argument that it was pretext that he was fired for the incident with, is it Einig? Ashley Einig. Einig? Yeah, absolutely, Your Honor, because Jeff Brooks is saying fits of rage on the telephone. Kathleen Cox is saying, why did you fire my brother? And he's not saying, oh, he wasn't fired, he quit. It's not until several conversations later that Toys R Us comes up with he quit. All right, let me just So we do think that that's a factual issue All right, I think I know the evidence. I mean, I think you might be convinced of that at this point, because I'm pulling out things that you're not mentioning. But on the jury issue here, let's say that if, I'm just saying this hypothetically, if you were to prevail and it was reversed, there's also the issue about whether you waived the jury, all right? And your excuse would appear to have been that you thought you filed it in state court before it was, before appellees removed it to federal court. That's correct. All right, so do you have any, do you have any case that says that just mere inadvertence and a goof is good enough to, you know, bring the jury back to life? Yeah, we certainly cited a couple cases in our opening brief, Ninth Circuit case and another case from another jurisdiction that specifically deal with discrimination cases. And I know there are cases out there, Pacific 50, 50, but But didn't they require a little more than just inadvertence? Right, that mere inadvertence is not enough. But in a discrimination case, where it's so important to observe the demeanor of, for example, the plaintiff, and where you have this particular importance of the nuanced balancing of the proof to determine intentional discrimination, we would say that in those sort of circumstances, that, you know, you should be able to get a trial even if that is a loophole. Well, but it still says you have to have more than inadvertence. That goes to why it's important, but you still have to have more than inadvertence, right? Right. Well, now, let's say, let's assume hypothetically if it is reversed, and, but this Court were to affirm that there's, that under an abuse of discretion, the jury waiver, you know, the judge's ruling on that stands. I didn't see anything in the record that would indicate that this district judge had sort of any animus for you and that you wouldn't be able to get a fair trial in a court trial. Is there, is there anything in the record that I should be looking at there? Well, I don't think we'd see any intentional bias by the district court. We're not accusing judge of that. I mean, we would like this remanded to a different judge, but I think it's mostly... Did you ask for that? No, we didn't. All right. But... That's a pretty high standard that you've got to... It is, and that's frankly... ...in the cases out there say, generally speaking, that summary judgment and trials are a different standard, and apparently this judge has never seen your client, number one, hasn't seen your client under cross-examination, wouldn't be able, you would have no knowledge of being able to evaluate how, what you would describe as his, you know, the results of his brain injury, how that would affect his cognitive skills or his interactive skills or anything. Right. No, I mean, we think that, I mean, we didn't ask for a different judge. We wouldn't be bringing this appeal if we didn't think we could get a fair hearing on remand, but we do think that the judge needs to look at all of the evidence. We asked for a re-hearing on reconsideration. We asked for an evidentiary hearing, and we do think it's important that the judge looks at the entire case and looks at the demeanor of the plaintiff and that there are factual issues here. I'm going to reserve the rest of my time. All right. Do either of my colleagues have any additional questions? All right. Then you have a couple of minutes left for rebuttal. Yes. Good morning, Your Honor. Good morning. May it please the Court. My name is Jeff Judd. I'm here today on behalf of Defendant Eppley Toys R Us. Before I jump into some of the issues, I just want to make two very quick initial comments. There's a lot of things being thrown around and discussed as being potential issues of fact or not issues of fact. Two things on the record are very clear. First of all, Mr. Keenan initiated an inappropriate customer interaction on June 13, 2001. The customer was upset. The customer complained. The incident led to the separation of Mr. Keenan from his position. That cannot be disputed. Ms. Einig complained to more than one person. Another employee in the store overheard the conversation, the discussion, the incident. There were written statements. There's deposition testimony. I don't think that – yeah, I would agree with you. That's not in dispute. Now, I can't speak for my colleagues, but I didn't see them disputing that either. And just with that, and just for an overall context, I just want to point out again how important customers are to a retail store such as Toys R Us. Customers are the lifeblood of the store. Customer service is critical to Toys R Us' ability to be competitive in the marketplace. That is a core issue to the company, and everything – and everybody who spoke and testified in this case talked about the importance of customer service, including Mr. Keenan. So with that being said, I want to touch briefly on the four separate issues we have here. There are four issues on appeal. I want to go through them briefly, and obviously we'll respond to questions as they come. Just so I have time to touch on them briefly, I actually want to go – to the extent you're okay with it, in reverse order, just making a few remarks about the jury demand and whether or not it was appropriate for Judge George to strike that jury demand. I would just remind Your Honors, and obviously you know this, but this is an abuse of discretion standard. There was a chance at the district court level to argue whether or not the judge should exercise his discretion to overturn the untimely jury demand. Those arguments were made. The judge exercised his discretion and decided, based on his review of the evidence, it was inappropriate to allow the case to go to a jury. That was decided. You now have the chance to review the record and that determination to see whether or not Judge George abused his discretion on that issue, not whether or not you agree with the decision he reached. Jumping to the – I guess going in reverse order backwards, there's an issue here about a post-summary judgment motion being filed, both a motion for reconsideration, a motion for evidentiary hearing. Again, an abuse of discretion standard, not whether or not you agree with Judge George, but whether or not he abused his discretion. As you review the motion for reconsideration, you'll see there's no new evidence, no new issues of law. In fact, the only new alleged evidence is an affidavit created after the fact, after the summary judgment motion, geared and designed to try to poke holes in the order that Judge George issued. As to the evidentiary hearing request, there were no prior requests for an evidentiary hearing. There was no case lost sighted that says we're now entitled to an evidentiary hearing. It was just simply a request thrown out to the judge, and the judge reviewed that, and in his discretion, he denied that request. Jumping forward again now to the substantive claims, the second substantive claim here – and there wasn't any prior discussion on it in response to the earlier questions – but there's a claim for breach of the implied covenant of good faith and fair dealing, a state law claim in Nevada. I don't really need you to spend any time on that unless my colleagues do. Okay. I mean, I think that's the underlying summary judgment that we're more – not that particular claim. That's what I want to make sure, just that it was undisputed, and I think that's reflected from the fact that one page of the brief – okay. I think you should kind of focus more on where there might – you know, on the evidence regarding whether he was – exactly, I guess, in terms of your reading of the law, are you saying that Brooks has to know that he's disabled, and he has to know how that – there would – and by inference, that the psychologist has to – would have to have said that his impairment would affect his ability to work with customers. And first of all, the psychological report was prepared after this June 13, 2001, incident. So Mr. Brooks never saw this report, and there's no prior discussion of psychological data prior to this incident. I just don't find that he – just because he was neat, even though the district judge said that, that that's really helpful on the issue. And I just want to point out, if you're relying on testimony and evidence in this psychological report, that was created after the fact. Mr. Brooks never knew that information. In this case, what I am saying, and what our brief points out, is it's not enough for a fellow employee or someone there in the workplace to have an assumption that somebody is slow. In fact, we've cited cases on that point. Just because we think someone is slow does not mean they are now disabled under the ADA. We're not saying that we have to know the exact extent of any alleged disability that we have to know specifically what it is, or even that there has to be an exact, specific request. But we are saying there's a middle ground in there, and in this case, it doesn't reach that level. What about that some people said that he was slow, some people said he acts sort of childlike. We have the – his sister initially, you know, being involved with – is it Mr. Weber, I think, the first guy that hired him. And then it seems that more problems came about with Brooks. And, you know, some of the things that are troubling to me is that, obviously, Mr. Brooks – apparently it's not disputed that he somehow – give me a reason why I shouldn't fire you, and that if you have someone that's slow, and their time card's up like this, they get called in, and there's something – there's disputed evidence about the Toys R Us vest. The blue vest. The vest. The courtesy vest, or whatever. And then he obviously leaves, and heads out, is upset, and all of that. And then it's not until somewhat later that it's ever first contended that he actually quit. It seems to me that there's certainly a tribal issue about whether he was quit or he was terminated. And if someone's slow and acts like a child, and he just takes off, it certainly seems that he thought he was fired, or there's a tribal issue on that. And if I can attack, there are several things you raised. Yeah. And then all of that seems to come back a little bit on the pretext issue for me. That if you look at the, you know, that Brooks – that whatever that interchange was, which waves in a card, he leaves, whether the vest was asked for or whatever. But there's something – and it immediately follows this incident with the customer, and it doesn't seem to be disputed that he overreacted to someone littering, because he's fastidious about – he doesn't like anyone littering. And then Brooks immediately calls Human Resources, then the sister tries to come in, and then it's much later in that they're saying that he quit. All of this seems to at least create a tribal issue as to pretext. Again, there are several points raised in there, if I could do my best to try to point on some of those things. First of all, there were some prior incidents within the prior months of some similar behavior, and that's on the record, and you can look at those reports. As to the whole issue, again, of being slow, and you pointed to the fact that you think several people thought he was slow or didn't know, and again, the record speaks for itself on these things, that there were several people, including his colleagues who'd worked with him for nine years, saying, we didn't know he was slow, we didn't know he was disabled. All right, but if some people say he is slow, some people say he acts like a child, and other people say we have no idea, I'm getting way in the evidence there. At the minimum of that spectrum there, if you can draw the line, is a few people who say, well, he was a little bit slow, that's it, and that goes up the spectrum to people who had no idea of this. That's the spectrum. As we talked about earlier, to know a disability, it's not just to know that he's slow, it has to be a stronger threshold than that. All right, but then when he had had customer problems before, what was the response of Toys R Us? To put him in the back and take him away from customers, right? The only things that really occurred from a customer service standpoint were just in the month or two before. There's a characterization that Mr. Keenan here is a maintenance employee. The maintenance duties were outsourced several years. He's over there for a period of nine years. Maintenance responsibilities were outsourced several years before that. He is on the floor constantly. We cite testimony in here, for instance, from another customer who comes in the store, a lady named Linda Cooney. Her son worked there for a summer, for a period of time, knew Mr. Keenan. The mother came into the store, she would say, three times a week as a customer. She would come in, she would talk to Mr. Keenan. He interacted with them. He answered their questions. They thought he was very knowledgeable of these things. He would deal with customers on a regular basis. In fact, one of the things that the other side points to in their briefs is how he received several praiseworthy letters. Well, let me take the devil's advocate. There's a part of me that says you don't have to be a rocket scientist to know that sometimes people, when they have limited, and they're limited in certain ways, they can do certain things, but then they can't do other things. And when other people coming in where he's able to help them and it goes well, why does that overcome the fact that when someone just leaves a cup, that he goes off because he can't drink? You know, why doesn't that just create a triable issue here? And again, if there had been a nine-year history of him yelling at customers like this, and we're just now saying on June, he's now getting upset at a customer, we're going to have a separation, that would be a different thing. We don't dispute that he was a decent employee for years and years, but then at the end, some things started to change there at the very end, but in connection with that, the store is going through a re-emphasis on customer service. They're talking about, we want to give our customers a Disney-like experience to talk about how important it is. In that context, we now have some situations, there's not just one limited place we can put Mr. Keenan where he can never interact with customers. That's just not possible. He's not just assigned to a back room where he can sit in a corner. He liked to go out, he did the Jeffrey to the giraffe situation, he interacted with customers, customers even praised his ability in letters sometimes. Well, I guess I found it a little incredible that putting on the Jeffrey giraffe suit somehow meant that he was okay. I mean, how many lawyers would go out and be Jeffrey the giraffe? I mean, it's almost like that job is pretty much, you're wearing a giraffe suit, you know. I didn't find that to be a sterling example of being able to deal in customer service or having really developed interpersonal skills. I appreciate that. I wouldn't downplay the importance of that position. Counsel, let me ask you this. Isn't your strongest position here the fact that there really is no evidence from the plaintiff's side that his inappropriate customer interaction, whatever you want to call that, was a manifestation of his disability? Isn't that the critical issue? It is. And again, we're not conceding that there's a prima facie case and some of those elements. Judge George went past that. He jumped past prima facie case and those things. Again, I'm not conceding it, but I recognize that Judge George found the other way. And it's up to you to draw your conclusions. The pretext was where he said there was no evidence of pretext, right? Certainly. But I think that connection, that nexus there between the action, the alleged disability, that really is the nuts and bolts of this case where it comes together and the evidence is not there. If you had an employee who was in a wheelchair, obvious disability, and he can't interact well with customers, he yells at customers, he can get fired for yelling at customers, and there's no problem with terminating him, correct? Certainly. Absolutely. They're not connected in any way. And that's how we view the situation here, Your Honor. All right. On the pretext, on whether or not he was fired, doesn't that logic only hold if Mr. Brooks thought he was firing Keenan? And the reason I say that is the very first thing he did, according to our record, after Keenan walked out, he picks up the phone, he calls HR and says, what am I going to do about this person? He did not have the authority to unilaterally fire Mr. Keenan at that point. He had to go through HR. So, yeah, there was a discussion. So didn't he think he fired him, though? I'm sorry, do I what? Did he think he fired him at that point? No, he did not. He called HR and said, here's the situation that's going on, let me explain what's going on. Ms. Stitch, the HR representative, was not there at the time. There was a later phone call. Could someone infer from his conduct, the undisputed conduct, that he did fire the person? No. I think it's fair to assume that he thought this may be a terminable offense, but he knew I had no authority to terminate this employee. I need to go through HR, discuss the situation, HR makes the decision. So what was he doing, just removing him, or what was he doing at that time? What? Initially, initially it was a situation of, let's address the situation. A customer complained, he goes right to Mr. Keenan to discuss about the situation. This is inappropriate. This cannot take place in the workplace. And then when Mr. Keenan leaves. Does he say, does he admit saying, what would stop me from firing you and moving the card, the time card? As I recall his testimony, that is not the way he characterizes it. Well, how did he characterize it? There was a discussion. Mr. Araneta was there for part of the discussion. It was, you cannot do this type of behavior. The situation was addressed. They think it's resolved. He goes back to work. And then Mr. Keenan, a little bit later, he goes back to his locker or another room that's there. And a few minutes later, goes by, throws the vest, and Mr. Araneta leaves. All right. But you don't, but you're not entitled to that inference. You have to go with the inference that's most favorable to the plaintiff, right? I understand the standard. Yeah. Yes. So when, even in the best case scenario, did, from your perspective, did your, did Toys R Us say that they terminated him? I'm sorry. Do I believe that? I guess I just don't understand. Oh, well, when did, when did, when did Toys R Us first take the position that he quit? It was right then. Well, when did they say it? Because didn't Ms. Cox come in with Mr. Keenan after that? It would have been the next day. And if he hadn't quit, wouldn't he? He called that, if I understand. If he hadn't quit and you hadn't terminated him yet, why didn't he just go back to work then? When they understood that he had, well, again, he walked out. There's no communication. He simply leaves. The next connection or communication with the parties is when Ms. Cox, the sister, who's not the guardian at the time, she's the sister. She calls Mr. Brooks. There's the discussion. As I understand the record, she was told, I've called HR. I need to hear what's going to happen from HR. It's basically a suspension situation. But he had left. He's now out. There's a dialogue that goes back and forth. I think it's the next day she comes back and resorts. So what does he say to the sister? He has quit? My understanding of the record is initially there's no termination, and then he left. No, I asked you, what did he say to the sister? You can answer that question, please. Oh, to Mr. Araneta, his assistant manager? Whoever the sister was talking to. I do not believe my understanding. No, just tell me what he said. Don't tell me what you believe. He never said he was fired. What did he say? Just that he left. He threw the vest and he left. That was it. Is that what the manager said? He left? They both said that, yes. Both the manager and the assistant manager, he left. He threw the vest, he left. They both agreed on that point. And what was the implication of that remark? By throwing the vest and leaving, the implication was that he walked out. That he quit. Exactly. That's their position, then. Yes. At that point, they didn't think they'd fired him. Correct. It could be a terminal offense, and that's why they called us into HR to decide what's going on, and they still continued that communication. But their understanding was he walked out the door, he's gone. It seems to me there are issues that have got to be tried. You got off the hook awfully easily. I appreciate your review of the record. Again, I would just point out that if Judge George even has a final point, I see my time is out. Judge George did point out, though, and I would agree with this, that at the end of the day, whether he quit or whether he was fired, that's not really the sole focus of this appeal. Not the sole, no. And with that, was there further questions? I believe I'm out of time. All right. Let me find out if my colleague's having any. Does anyone have any further questions?  All right. That being said, thank you for your argument. Thank you, Your Honor. All right. You have two minutes, but if you don't you don't have to use them if you don't want to. Thank you, Your Honor. Unless the Court has any specific questions, I would like to address the point. I'm sorry. All right. The time's not running. Well, go ahead. I appreciate the extra time. No, it's not extra time. It's the time you have. Thank you, Your Honor. First of all, on the question of whether there's any evidence of the manifestation of the disability, what the District Court said was that the fact that he could wear the Jeffrey giraffe costume was evidence that he could function with adults. Now, I just want to point out that when you're playing Jeffrey the giraffe, you're not even allowed to speak. So I don't think that I would agree that that's not very good evidence to rebut whether or not there was the inability to interact with adults. At an adult level, was a manifestation of the disability. And I think we are entitled to draw the inference if the psychologist says that he functions at a seven-year-old level. We're entitled to draw the inference that a normal functioning adult would be able to perceive that. I mean, for the purpose of where we are in summary. All right. Is that in the record before your motion for consideration? That's in the psychologist's report. That's part of the original document. The psychologist says functions at a seven-year-old level, consistent with somebody that has a seven-year-old IQ and has learned to function better with time. That's in the sealed document that we submitted. And I also want to just real briefly point out that there's a lot of other evidence here of pretext. We have evidence that John was teased or harassed by the management. We have the investigative report from the state proceeding where Ms. Weiss says that the managers harassed him. We have John's testimony that Brooks, in particular, would tease him about being in the Gulf War, would ask him to read documents. And John said, I told him I couldn't read. He told me, if you don't sign that, then bad things are going to happen to you. We'd ask that the summary judgment be reversed. Thank you. All right. Thank you both for your argument. This matter will stand submitted. This court is in recess until tomorrow morning.
judges: Martinez, Noonan, Callahan